**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

| | |
|---|---|
| IN RE:<br><br>STONE*WALL FARM STALLIONS I, LLC<br><br>Debtor | BANKRUPTCY NO. 10-52318-tnw<br><br>CHAPTER 11 |

**EMERGENCY MOTION OF JPMORGAN CHASE BANK, N.A.
FOR RELIEF FROM STAY AND ABANDONMENT OF COLLATERAL**

JPMorgan Chase Bank, N.A. ("Chase"), a secured creditor in this case, based on extenuating circumstances, hereby moves the Court for immediate entry of an order granting Chase relief from the automatic stay imposed by 11 U.S.C. § 362 with respect to certain thoroughbred stallions, and to abandon those stallions to Chase pursuant to 11 U.S.C. § 554(b). In support of this Motion, Chase states as follows:

### I.  INTRODUCTION

Chase seeks emergency stay relief in order to recover possession of its collateral, comprised of two live thoroughbred stallions.  Such relief is required on an emergency basis because Chase is inadequately protected and the value of the stallions will decline immediately and precipitously if the stallions are not immediately marketed and sold to parties who have expressed interest in acquiring them.  Further, relief is also warranted because the Debtors have conceded that they are unable to maintain mortality insurance on the Stallions, which will soon lapse without payment of premiums, or make payments necessary to allow progeny of the Stallions to be Breeders' Cup eligible, which will irrevocably harm the market value of the Stallions and negatively affect the value of existing accounts receivable from their breeding activities.  Further, Debtors do not have the ability to fund the expenses necessary to ensure the

health and safety of the stallions. In addition, in contravention of a loan covenant and following notice that Chase made a motion in state court to appoint a receiver to take possession of and sell the subject stallions, the Debtors physically moved the stallions from Kentucky to Florida, further placing in danger Chase's interest.

At the hearing on this motion, Chase will request permission of the Court to call a live expert witness, Dan Rosenberg of Rosenberg Thoroughbred Consulting, to testify about the significance of Breeders' Cup eligibility and mortality insurance. Given that the collateral in this case consists of live animals whose value fluctuates greatly and quickly based on the timing of entry into certain markets, Chase anticipates that this testimony will be informative and helpful to the Court.

## II.     BACKGROUND

1.     This Motion is brought pursuant to Bankruptcy Rule 4001 and in conformity with Rule 9014.

2.     On July 20, 2010 ("Petition Date"), Debtors, Stone*Wall Farm Stallions I, LLC ("Stone*Wall I") (Case No. 10-52318), Stone*Wall Farm Stallions VII, LLC ("Stone*Wall VII") (Case No. 10-52319), Stone*Wall Farm Stallions Racing Division I, LLC ("Stone*Wall Racing") (Case No. 10-52317), Hotcopri, LLC ("HotCoPri") (Case No. 10-52315), and Malandin, LLC ("Malandrin") (Case No. 10-52316) filed petitions for relief under Chapter 11 of the Bankruptcy Code. (Collectively, Stone*Wall I, Stone*Wall VII, Stone*Wall Racing, HotCoPri and Malandrin are referred to herein as the "Debtors").

3.     On July 20, 2010, Stone*Wall I filed a motion seeking to consolidate the Debtors' bankruptcy cases for administrative purposes under Stone*Wall Farm Stallions I, LLC, Case No. 10-52318 (the "Motion to Consolidate"). [Doc. No. 6]. The Motion to Consolidate is scheduled

to be heard by this Court on July 27, 2010. In anticipation that the Motion to Consolidate will be granted, Chase hereby files this Motion in the within requested lead case for the Debtors.

4. This Court has jurisdiction over this matter pursuant to 11 U.S.C. §§ 157 and 1334. Venue of the Debtors' cases and this Motion in this District is proper pursuant to 28 U.S.C. § 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

5. Chase has claims against Debtors, Stone*Wall I and Stone*Wall VII which are secured by certain *live* thoroughbred stallions, their shares, breeding rights, evidences of ownership, policies of insurance and all proceeds thereof and certain other stallion interests as more particularly described below.

### A. STALLION LOAN DOCUMENTS

6. On or about January 31, 2008, non-debtor, Nevertell Farm Kentucky II, LLC ("Nevertell II") with Debtors, Stone*Wall I and Stone*Wall VII (collectively, the "Stallion Loan Borrowers"), for value received, executed and delivered to Chase a Second Amended and Restated Promissory Note[1] (as amended, the "Stallion Loan Note"), in the original principal amount of Twelve Million Four Hundred Thousand Dollars ($12,400,000). A copy of the Stallion Loan Note is attached hereto as Exhibit A.

7. To secure repayment of the Stallion Loan Note and all modifications, extensions and renewals thereof, the Stallion Loan Borrowers granted Chase a security interest in and to the Thoroughbred stallions LEROIDESANIMAUX by CANDY STRIPES out of DISSEMBLE and A.P. WARRIOR by A.P. INDY out of WARRIOR QUEEN (collectively, the "Stallions") and all stallion shares, breeding rights, evidences of ownership, policies of insurance and all proceeds thereof pursuant to an Amended and Restated Loan and Security Agreement dated March 9,

---

[1] The Second Amended and Restated Promissory Note amended and restated an Amended and Restated Promissory Note of the Stallion Loan Borrowers to Chase dated March 9, 2007.

-3-

2007 (as amended, the "Stallion Loan Security Agreement").  The Stallion Loan Security Agreement is attached hereto as Exhibit B.  (Collectively all collateral secured by the Stallion Loan Security Agreement is referred to herein as the "Stallion Loan Collateral").

8. Among other collateral, the Stallion Loan Security Agreement secured all other obligations, indebtedness and liabilities of the Stallion Loan Borrowers or any of their parent entities, subsidiaries, or successors or assigns now existing or thereafter formed, to Chase, whether the Stallion Loan Borrowers may be jointly or severally liable as a debtor, maker or among other things, a guarantor.  *See* Exhibit B at § 3.1.

9. Chase is the owner and holder of the Stallion Loan Note.

10. The principal amount of the Stallion Loan Note and all sums due under the Stallion Loan Note, bear interest at a floating rate of the CB Floating Rate of Chase plus 3.5% per annum (representing the rate of CB Floating Rate plus 1.5% plus an additional 2% default rate).

11. By virtue of the Stallion Loan Note and the Stallion Loan Security Agreement, and to secure the indebtedness and obligations owing to Chase under the Stallion Loan Note, Chase has a lien and security interest on the Stallion Loan Collateral, which lien and security interest is first, prior and superior to any and all other liens thereon.

12. Pursuant to the Stallion Loan Note and the Stallion Loan Security Agreement, all amounts due for principal, interest and late charges or other payments of any kind made by Chase are further secured by Chase's lien on the Stallion Loan Collateral as evidenced by and described in Chase's Stallion Loan Note UCC Financing Statement attached hereto as Exhibit C.

13. The Stallion Loan Borrowers have defaulted on their obligations to Chase under the Stallion Loan Note and the Stallion Loan Security Agreement by failing to make required and timely payments of principal and accrued interest and failing to meet other covenants applicable under such agreements, despite being given ample opportunity to cure. Based on such defaults, in accordance with the terms of the Stallion Loan Note and the Stallion Loan Security Agreement, the entire indebtedness under the Stallion Loan Note has been accelerated and Chase has declared such indebtedness due and payable.

14. As of July 23, 2010, there is due and owing to Chase under the Stallion Loan Note a total amount of $3,503,044.18, which consists of the principal sum of $3,430,363.36, plus interest in the amount of $72,680.82, plus additional interest at $643.19 per diem thereafter until paid in full, along with all late charges, attorney's fees and costs. *See* Affidavit of Margaret O'Sullivan attached hereto as Exhibit D.

B. **NEVERTELL II CROSS COLLATERALIZED LOAN DOCUMENTS**

15. On or about January 31, 2008, Nevertell II, for value received, executed and delivered to Chase an Amended and Restated Revolving Line of Credit Note (as amended, the "Nevertell II Note "), in the original principal amount of Four Million Five Hundred Thousand Dollars ($4,500,000). A copy of the Nevertell II Note is attached hereto as Exhibit E.

16. To secure repayment of the Nevertell II Note and all modifications, extensions and renewals thereof, Nevertell II granted Chase a security interest in and to certain property of Nevertell II pursuant to an Amended and Restated Loan and Security Agreement dated January 31, 2008 (as amended, the "Nevertell II Security Agreement"). The Nevertell II Security Agreement is attached hereto as Exhibit F. (Collectively all collateral

secured by the Nevertell II Security Agreement is referred to herein as the "Nevertell II Loan Collateral").

17. Among other collateral, the Nevertell II Security Agreement secured all other obligations, indebtedness and liabilities of Nevertell II or any of its parent entities, subsidiaries, or successors or assigns now existing or thereafter formed, to Chase, including, but not limited to, the Stallion Loan Note, whether Nevertell II may be jointly or severally liable as a debtor, maker or among other things, a guarantor.  *See* Exhibit F at § 3.1.

18. Chase is the owner and holder of the Nevertell II Note.

19. The principal amount of the Nevertell II Note and all sums due under the Nevertell II Note, bear interest at a floating rate of the CB Floating Rate of Chase plus 1.5% per annum (representing the rate of the CB Floating Rate of Chase plus 1.5% plus an additional 2% default rate).

20. By virtue of the Nevertell II Note and the Nevertell II Security Agreement, and to secure the indebtedness and obligations owing to Chase under the Nevertell II Note, Chase has a lien and security interest on the Nevertell II Loan Collateral, which lien and security interest is first, prior and superior to any and all other liens thereon.

21. Pursuant to the Nevertell II Note and the Nevertell II Security Agreement, all amounts due for principal, interest and late charges or other payments of any kind made by Chase are further secured by Chase's lien on the Nevertell II Loan Collateral as evidenced by and described in Chase's Nevertell II Note UCC Financing Statement attached hereto as Exhibit G.

22. Under the Amended and Restated Guaranty executed and delivered on January 31, 2008, Stone*Wall I guaranteed any and all amounts due and owing Chase by Nevertell II,

including, but not limited to, those under the Nevertell II Note in an aggregate amount, not to exceed, $4,500,000 plus any expenses, reimbursements or other costs or fees due Chase under the Nevertell II Security Agreement (as amended, the "Nevertell II Stone*Wall I First Guaranty").  A copy of the Nevertell II Stone*Wall I First Guaranty is attached hereto as <u>Exhibit H</u>.

23.     Under the Amended and Restated Guaranty executed and delivered on January 31, 2008, Stone*Wall VII guaranteed any and all amounts due and owing Chase by Nevertell II, including, but not limited to, those under the Nevertell II Note in an aggregate amount, not to exceed, $4,500,000 plus any expenses, reimbursements or other costs or fees due Chase under the Nevertell II Security Agreement (as amended, the "Nevertell II Stone*Wall VII First Guaranty").  A copy of the Nevertell II Stone*Wall VII First Guaranty is attached hereto as <u>Exhibit I</u>.

24.     Nevertell II has defaulted on its obligations to Chase under the Nevertell II Note and the Nevertell II Security Agreement by failing to make required and timely payments of principal and accrued interest and failing to meet other covenants applicable under such agreements, despite being given opportunity to cure.  Based on such defaults, in accordance with the terms of the Nevertell II Note and the Nevertell II Security Agreement, the entire indebtedness under the Nevertell II Note has been accelerated and Chase has declared such indebtedness immediately due and payable.

25.     As of July 23, 2010, there is due and owing to Chase under the Nevertell II Note a total amount of $3,548,474.42, which consists of the principal sum of $3,487,404.35, plus interest in the amount of $61,070.07, plus additional interest at $653.89 per diem thereafter until paid in full, along with all late charges, attorney's fees and costs.  See <u>Exhibit D</u>.

26. Despite Chase's demands, Nevertell II and the Nevertell II Guarantors have failed to cure the default of Nevertell II and to satisfy the amounts due and owing Chase under the Nevertell II Note.

### C. TOTAL AMOUNTS OWED TO CHASE

27. As of July 23, 2010, there is a total of $7,051,518.60 due and owing to Chase under the Stallion Loan Note and the Nevertell II Note, plus additional applicable interest at each Note's rate thereafter until paid in full, along with all late charges, attorney's fees and costs. *See* Exhibit D.

28. Pursuant to the Stallion Loan Security Agreement, the Stallions are collateral under the Stallion Loan Note and therefore, also for the subsequent amounts loaned under the Nevertell II Note. *See* Exhibit B at § 3.1.

29. Pursuant to the terms of the Stallion Loan Documents and the Nevertell II Cross Collateralized Loan Documents and applicable law, Chase is entitled to permanent possession, custody and control of the Stallion Loan Collateral and the Nevertell II Loan Collateral, which among other collateral, includes the Stallions.

### III. ARGUMENT

30. The Court should grant relief from the automatic stay where "cause" exists, "including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). Because the Bankruptcy Code does not define "cause," courts are to determine whether cause exists on a case-by-case basis, considering the totality of the circumstances. *In re Trident Assocs. Ltd. P'Ship*, 52 F.3d 127, 131 (6th Cir. 1995). The Debtor bears the burden of proof to demonstrate the existence of adequate protection. *See* 11 U.S.C. § 362(g)(2). A lack of adequate protection exists where the collateral is not insured. *See, e.g., In*

*re Davis*, 989 F.2d 208, 212 (6th 1993) ("courts have held that a secured creditor is not adequately protected if no hazard insurance exists on the collateral").  A lack of adequate protection also exists where the value of the collateral is declining.  *See, e.g., In re Buttermilk Towne Ctr. LLC*, 210 Bankr. LEXIS 2126, *8 (Bankr. E.D. Ky. June 29, 2010) ("if the value of the Bank's secured claim were declining, it would lack adequate protection") (internal quotations omitted).

31.     It is imperative to the care, maintenance and safeguarding of the Stallions that the persons/entities managing them be in sound financial condition such that they are capable of paying the expenses related to the maintenance of the Stallions.  Debtors, by their own admission, are not in such a position.

32.     On June 18, 2010, the Debtors sent a letter to Chase advising that their cash flow was "extremely limited" and that they "will not be able to make the Breeders' Cup payments . . . nor the next insurance payment" on the Stallions.  A true and correct copy of this letter is attached as <u>Exhibit J</u>.

33.     Here, cause exists for stay relief for multiple reasons, including: (i) in breach of loan covenants, the Debtors changed the physical location of the Stallions, threatening Chase's ability to insure the health, safety and well-being of the Stallions; (ii) mortality insurance on the Stallions is soon to lapse, and the Debtors lack the ability to renew coverage; (iii) Debtors are unable to pay fees due to Breeders' Cup to allow progeny to be Breeders' Cup eligible; (iv) the Debtors are unable to pay of the operating expenses of the Stallions, including feeding, grooming, cleaning, veterinary and farrier expenses; and (v) the value of the Stallions is at risk of declining if they are not marketed and sold soon.

**A. DEBTORS HAVE MOVED THE STALLIONS OUT OF STATE.**

34. The Debtors specifically contracted with Chase such that the physical location of the Stallions could not be changed without Chase's consent:

> 8.5 <u>Location of the Stallions.</u>
>
> The Borrower's shall not move or permit to be moved the Stallions from Stone*Wall Farms without first obtaining the Bank's prior written consent, which shall not be withheld or delayed unreasonably.

(<u>Exhibit B</u>, Stallion Loan Security Agreement, § 8.5.)

35. On information and belief, and without obtaining the prior written consent of Chase, on or about July 19, 2010, after receiving notice that Chase had filed a motion to appoint a receiver to take possession of the Stallions and sell them, the Debtors moved the Stallions out of the Commonwealth of Kentucky with intention to place them at a location in the State of Florida.

36. In addition to violating a loan document provision, unilaterally changing the physical location of the Stallions to a far-away state jeopardizes Chase's interest by impairing its right and ability to inspect the Stallions to ensure their continued health and safety.

37. Because the Debtors have removed the Stallions to a far-away physical location, Chase is inadequately protected because it cannot monitor and inspect the Stallions. This fact warrants immediate relief from the automatic stay and an abandonment of the Stallions to Chase.

**B. MORTALITY INSURANCE ON THE STALLIONS WILL SOON LAPSE.**

38. On information and belief, mortality insurance on the Stallions will soon lapse unless premium payments are made. To protect its interest in the Stallions, Chase itself made the June monthly insurance premium payment, but as of July 18, 2010 there is $7,896.17 due and owing for insurance coverage. *See* Insurance Invoice attached hereto as <u>Exhibit K</u>.

39. The Debtors have stated in written correspondence to Chase that they do not have the means to pay said premium. *See* Exhibit J.

40. Additionally, on information and belief, it is unclear whether the current insurer, Muirfield Insurance, Inc., is likely to renew or continue any policies regarding the Stallions if they remain in the care of the Debtors based on the Debtors' failure to demonstrate the financial wherewithal to provide adequate veterinarian and other care for the Stallions and because the Stallions have been moved out of state to an unknown location. Moreover, based on the circumstances, acquiring any potential replacement insurance for the Stallions while in the Debtors' care will be difficult to obtain.

41. The Debtors inability to pay for insurance on the Stallions and the likelihood of insurers to deny coverage constitutes a lack of adequate protection warranting immediate relief from the automatic stay and abandonment of the Stallions to Chase.

**C. BREEDERS' CUP WILL SOON MAKE STALLION PROGENY INELIGIBLE FOR BREEDERS' CUP RACES.**

42. On information and belief, the Breeders' Cup has set a deadline of Tuesday, July 27, 2010 by which past due 2009 fees must be paid in respect of the subject Stallions to allow owners of progeny of the Stallions the right to nominate such foals for the Breeders' Cup. The failure to pay these fees by the deadline means that foals from the Stallions born in the year in which fees were not paid are not eligible to be nominated to Breeders' Cup races, which will greatly and inalterably diminish the stud value of the Stallions themselves.

43. Moreover, on information and belief, the Debtors have publicly advertised that the progeny of the Stallions is eligible to be nominated to Breeders' Cup races. *See, e.g.,* Excerpts from 12/3/2007 *The Blood-Horse Stallion Register* (denoting Stallion foals as "Nominated to Breeders' Cup) (attached as Exhibit L). Should the past due fees remain unpaid

-11-

and the Stallion foals not be Breeders' Cup eligible, 2009 stud fee accounts receivable (which also constitute Chase's collateral pursuant to the Stallion Loan Security Agreement) will likely become less collectible and therefore diminish in value. *See* Exhibit B at § 3.2(c), (e) (including "breeding rights," "proceeds," and "progeny," and "accounts receivable" in definition of Collateral).

44. For past due 2009 Breeders' Cup fees, the Debtors currently owe $15,912.50 for AP WARRIOR, $18,581.27 for LEROIDESANIMAUX. For 2010 Breeders' Cup fees, the fees are $9,900 for AP WARRIOR and $14,900 for LEROIDESANIMAUX payable in quarterly installments.

45. The Debtors have stated in written correspondence to Chase that they do not have the means to pay said fees. *See* Exhibit J.

46. The Debtors inability to pay the Breeders' Cup fees on the Stallions constitutes a lack of adequate protection warranting immediate relief from the automatic stay and abandonment of the Stallions to Chase.

**D.  THE DEBTORS ARE INCAPABLE OF PAYING FOR UPKEEP, MEDICAL AND OTHER EXPENSES ASSOCIATED WITH THE STALLIONS.**

47. On information and belief, the Debtors are incapable of paying for the regular expenses associated with ownership of live thoroughbreds. To preserve the value of the Stallions, numerous expenses must be incurred and timely paid, including but not limited to: (i) feeding, grooming and cleaning expenses; (ii) veterinary expenses; (iii) farrier expenses; (iv) sales preparation expenses and entry fees; (v) insurance premiums; (vi) Breeders' Cup nomination fees based on breedings to the Stallions; and (vii) other expenses. In the event these

-12-

expenses are not timely paid, the health and safety of the Stallions will be jeopardized, the value of the Stallions will diminish, and Chase will be irreparably and materially harmed.

48. Given that the Debtors have stated in a writing that their cash flow is "extremely limited" and given that the Debtors have not sought permission from the Court to use cash collateral for such upkeep expenses, Chase reasonably believes that the Debtors do not have the ability to pay for these upkeep expenses. *See* Exhibit J; 11 U.S.C. 363(c)(2).

49. Because the Debtors are incapable of funding these expenses associated with the Stallions, Chase is inadequately protected and entitled to immediate relief from the automatic stay and abandonment of the Stallions.

**E.   THE VALUE OF THE STALLIONS WILL DECLINE IF THEY ARE NOT SOLD.**

50. In light of the Debtor's inability to care for the Stallions and otherwise protect Chase's interest, the value of the Stallions must be maximized. The value of the Stallions can only be maximized by private sale.

51. Thoroughbred stallions breed in either or both of the Northern Hemisphere breeding season which begins in mid-February and ends in mid-July or the Southern Hemisphere breeding season which begins in mid-August and ends in mid-December. On information and belief, there exist parties interested in the immediate purchase of the stallions for both Northern and Southern Hemisphere breeding seasons. Should relief from the stay not be granted and Chase not be permitted to market and sell the Stallions immediately, the marketability of the stallions for either the 2010 Southern Hemisphere breeding season will be damaged.

52. Moreover, Debtors have conceded that they lack financial wherewithal to maintain ownership of the Stallions and meet the significant economic burden of owning them, a

-13-

problem that will exacerbate with the passage of time. The value-maximizing alternative is to sell the Stallions privately to one of the parties who have expressed interest in their purchase.

53. As a result of the above, it is essential to the commercial marketability of a horse that they be marketed and sold promptly.

54. Because of the likelihood that the Stallions will decline in value if not promptly sold, relief from the stay and abandonment of the Stallions to Chase is warranted.

## CONCLUSION

WHEREFORE, Chase respectfully requests that the Court enter an Order, on an emergency basis (1) modifying the automatic stay to the extent necessary to permit Chase to take immediate possession of the Stallions; (2) abandoning the Stallions to Chase; and (3) granting such additional and further relief as the Court deems equitable and just. A proposed Order is attached herewith.

## NOTICE FOR HEARING

The parties will please take notice that the Motion Relief from the Automatic Stay filed by Chase Bank will be heard by the Court on **July 27, 2010 at 9:30 a.m.**, or as soon thereafter as counsel may be heard, in the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East Vine Street, Third Floor Courtroom, Lexington, Kentucky 40507.

Respectfully submitted,

*/s/ Valorie D. Smith*
Elizabeth Lee Thompson
Valorie D. Smith
STITES & HARBISON, PLLC
250 W. Main Street, Suite 2300
Lexington, KY 40507-1758
Telephone: (859) 226-2300

Brian H. Meldrum
STITES & HARBISON, PLLC
400 W. Market Street, Suite 2800
Louisville, KY 40207

COUNSEL FOR MOVANT, JPMORGAN CHASE BANK, N.A.

## CERTIFICATE OF SERVICE

This is to certify that the foregoing Motion was served the 23rd day of July, 2010, electronically in accordance with the method established under this Court's CM/ECF Administrative Procedures upon all parties in the electronic filing system in the case, by electronic mail and/or first class mail.

*/s/Valorie Smith*
Valorie Smith

CQ42:40501:794945:5:LOUISVILLE

-16-

Copies to:

Rachelle C. Dodson
John Thomas Hamilton
Philip Hanrahan
Stephen P. Stoltz
U.S. Trustee

Ronald J. Bamberger
P.O. Box 1598
Owensboro, KY 42302